# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ANTHONY BESHWATE, JR., et al., | Case No. 1:17-cv-00417-SAB |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CARMAX' MOTION TO DISMISS AND VACATING DECEMBER 13, 2017 HEARING |
| v. | |
| BMW OF NORTH AMERICA, LLC, et al., | (ECF Nos. 36, 38, 39) |
| Defendants. | TEN DAY DEADLINE |

Currently before the Court is CarMax's motion to dismiss Plaintiffs' second amended complaint. The Court, having reviewed the record, finds this matter suitable for decision without oral argument. <u>See</u> Local Rule 230(g). Accordingly, the previously scheduled hearing set on December 13, 2017, will be vacated and the parties will not be required to appear at that time.

Having considered the the moving, opposition and reply papers, the declarations and exhibits attached thereto, as well as the Court's file, the Court issues the following order.

## I.

## PROCEDURAL HISTORY

On February 17, 2017, Plaintiffs Richard Anthony Beshwate, Jr. ("Richard"), and Bonnie Joy Beshwate ("Bonnie") (collectively "Plaintiffs") filed this action in Fresno County Superior Court. (ECF No. 1-1.) On March 22, 2017, Defendant CarMax Auto Superstores California,

1

LLC ("CarMax") removed this action to the Eastern District of California with the consent of Defendant BMW of North America, LLC ("Defendant BMW"). (ECF No. 1.) On March 29, 2017, Defendant BMW filed an answer and CarMax consented to the jurisdiction of the magistrate judge. (ECF Nos. 7, 8.)

CarMax filed a motion to dismiss and motion to strike on April 25, 2017. (ECF Nos. 11, 12.) On April 28, 2017, Defendant BMW consented to the jurisdiction of the magistrate judge. (ECF No. 13.) On May 1, 2017, Plaintiffs consented to the jurisdiction of the magistrate judge. (ECF No. 14.) At the stipulation of the parties, Plaintiffs were granted leave to file an amended complaint and CarMax's motion to dismiss and motion to strike were terminated. (ECF No. 21.) On August 15, 2017, Plaintiffs filed a first amended complaint. (ECF No. 24.)

Defendant BMW filed an answer to the first amended complaint on August 29, 2015. (ECF No. 26.) CarMax filed a motion to dismiss and motion to strike on September 5, 2017. (ECF No. 27.) On September 20, 2017, Plaintiffs filed an opposition to the motion to dismiss and motion to strike. (ECF No. 30.) On September 26, 2017, CarMax filed a reply. (ECF No. 31.) On October 4, 2017, an order was filed granting CarMax' motion to dismiss and granting Plaintiffs leave to file an amended complaint. (ECF No. 33.)

Plaintiffs filed a second amended complaint on October 18, 2017. (ECF No. 35.) On November 7, 2017, CarMax filed a motion to dismiss the second amended complaint. (ECF No. 36.) On November 28, 2017, Plaintiff filed a notice of errata regarding the second amended complaint. (ECF No. 37.) On November 29, 2017, Plaintiff filed an opposition to the motion to dismiss. (ECF No. 38.) CarMax filed a reply on December 6, 2017. (ECF No. 39.)

## II.

## ALLEGATIONS IN SECOND AMENDED COMPLAINT

Plaintiffs' second amended complaint alleges causes of action against CarMax for breach of the implied warranty of merchantability in violation of California Civil Code section 1792; violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq.; and violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq. based on Plaintiffs' purchase of a used 2011 BMW 550i Gran Turisimo.

Around October 5, 2014, Richard was searching the internet to purchase a used vehicle for his family. (Sec. Am. Compl. ("SAC") ¶ 16.) He came across an advertisement by CarMax for a used BMW 55i and sent a copy to Bonnie. (SAC ¶ 16.) This vehicle stood out as it advertised that it was in excellent condition with low miles, had the manufacturer's warranty, and was represented to have CarMax' certified quality inspection and warranty. (SAC ¶¶ 17, 18.)

Plaintiffs contacted CarMax regarding the status of the vehicle around the end of October and was told that it was still available for sale, was a CarMax certified vehicle, had been inspected pursuant to CarMax' rigorous standards and had passed inspection, and was in perfect or excellent condition with no mechanical issues. (SAC ¶ 19.) On November 2 or 3, 2014, Plaintiffs went to CarMax to test drive the vehicle. (SAC ¶ 21.) A sales person for CarMax, Joe Martinez, repeatedly represented the attributes of the vehicle. (SAC ¶ 21.) Mr. Martinez informed Plaintiffs that the vehicle was a great car, in "perfect" condition with "no problems" and with low mileage and the factory warranty. (SAC ¶ 21.) Mr. Martinez emphasized that the vehicle had been subjected to CarMax' extensive and rigorous mechanical inspection, pointing out the 125-point quality inspection checklist and that the vehicle had passed the inspection thereby meeting CarMax' high quality standards. (SAC ¶ 21.) Mr. Martinez stated that the vehicle had no mechanical issues and was a great value at the offered price. (SAC ¶ 21.) Plaintiffs test-drove the 2011 BMW which had been advertised and a Mercedes Benz vehicle but left without buying either vehicle. (SAC ¶¶ 22, 23.)

On November 3, 2014, Mr. Martinez sent Plaintiffs an e-mail thanking them for visiting and confirming the test drive of the vehicles. (SAC ¶ 24.) The e-mail stated "CarMax Quality Certified All of our used cars are CarMax Quality Certified. That means the way we carefully select, renew, and protect every CarMax car ensures our commitment to quality is met." (SAC ¶ 24.) The e-mail also included a link to CarMax's website regarding the "whole story on Quality" in which CarMax represented that CarMax ensured that it only selects the best used cars, renews each car, and the experienced technicians put every vehicle through CarMax' rigorous Certified Quality Inspection, representing that over 125 points must be checked before a vehicle meets

1  CarMax' high standards. (SAC ¶ 25.) These representations were made to induce Plaintiffs to
2  purchase. (SAC ¶ 26.)

3      During this period, CarMax also represented though its advertising and marketing
4  materials posted on their website that CarMax provided quality, value, service and is a company
5  you can trust. (SAC ¶ 27.) These materials also represented to all consumers that "CarMax
6  quality is knowing that you can depend on your car, day after day, year after year. Every car we
7  sell is carefully inspected and reconditioned to the best condition possible – in fact, we spend
8  over 12 hours, on average on each used car[;]" and that every used car undergoes a rigorous 125
9  point inspection which includes that engine and transmission, plus cooling and fuel systems.
10 (SAC ¶¶ 28, 29.) CarMax also represented through its advertising and marketing that these
11 inspections are ongoing to ensure that the cars meet the high quality standards and CarMax cars
12 are scrutinized like no others. (SAC ¶ 30.) CarMax represented that it invests time and money
13 renewing every new car so that the consumer does not have to. (SAC ¶ 31.) Plaintiffs relied on
14 this advertising regarding the quality of CarMax' used vehicles in choosing to purchase from
15 CarMax rather than competing dealers or on the private market. (SAC ¶ 32.)

16      On November 4, 2014, Plaintiffs returned to CarMax and purchased the BMW that they
17 had test driven from CarMax for a total of $38,895.87, including taxes, licensing fees, trade in,
18 and financing. (SAC ¶ 33.) As part of the purchase, Plaintiff's traded in their Mercedes Benz
19 and, having arranged financing through a third party, paid the purchase price in full. (SAC ¶¶
20 34, 35.) The vehicle was purchased primarily for personal, household and family use. (SAC ¶
21 36.) At the time the vehicle was purchased it had 26,135 miles on the odometer, and the
22 remainder of the basic factory warranty of 50,000 miles or 48 months was remaining. (SAC ¶
23 38.) The vehicle also included Defendant BMW's warranty against defects in materials and
24 workmanship to the original and each subsequent purchaser. (SAC ¶ 39.) The vehicle was
25 subject to Defendant BMW's seven-year or 70,000 mile California Emission Warranty. (SAC ¶
26 40.) In deciding to purchase the vehicle, Plaintiffs also relied on the warranty offered by
27 Defendant BMW. (SAC ¶ 41.) Plaintiffs expected that the vehicle would not be defective and
28 would continue to function normally in accord with Defendant BMW's specifications,

advertisements, and representations.  (SAC ¶ 42.)

As part of the vehicle purchase, CarMax provided to Plaintiffs a Certified Quality Inspection ("CQI") document representing the over 125 points that were checked that was not signed by anyone and does not contain any specific information about the vehicle or the nature and scope of the inspection.  (SAC ¶¶ 47-49.)  Plaintiffs were not provided a completed inspection report identifying the standards by which the vehicle had passed inspection or identifying any components that did or did not pass CarMax' standards.  (SAC ¶¶ 50, 51, 52.)  At no time were Plaintiffs informed that they were required to exhaust the manufacturer's warranty prior to CarMax being required to perform any repairs to the vehicle.  (SAC ¶ 55.)  Plaintiffs contend that CarMax provides a limited 30-day warranty and a buyer's guide that contradict one another and are therefore misleading and deceptive.  (SAC ¶ 56.)

Plaintiffs believe that the vehicle contains the N63 engine that has been found to be defective.  (SAC ¶ 64.)  The defects affect the vehicle's component parts, oil consumption, safety, reliability, and merchantability.  (SAC ¶ 64.)  Within a few months of purchasing the vehicle, Plaintiffs experienced mechanical defects and conditions with the vehicle that impacted its functionality and safe and reliable operation.  (SAC ¶ 65.)  The vehicle was running rough, as if it was running on half cylinders; had unexpected loss of power with vehicle hesitation and limited to no acceleration; vehicle shake, shudder or lugging; rough idling; problems with shifting gears; and failure to start.  (SAC 66.)

Plaintiffs were left stranded when the vehicle would not start and had to have the vehicle towed to Defendant BMW on at least one occasion.  (SAC ¶ 67.)  On other occasions, Plaintiffs were able to drive the vehicle very slowly to the repair facility at 15 to 20 miles per hour.  (SAC ¶ 67.)  While driving, Plaintiffs would experience drastic loss in power, and the vehicle would shut off in the middle of the roadway leaving Plaintiffs in a hazardous position.  (SAC ¶ 68.)  When the vehicle was restarted it would have a substantial loss of power.  (SAC ¶ 68.)  Plaintiffs were not able to rely on the vehicle to start and accelerate as needed which impacted the safe operation of the vehicle on the roadway and created a hazardous circumstance on the roadway.  (SAC ¶ 69.)  Plaintiffs were stranded on multiple occasions because the vehicle failed to operate.

(SAC ¶ 70.)  Due to the loss of acceleration, issues with gear shifting, shake and shuddering of the vehicle, stalling and failure to start, the vehicle is not in a safe condition.  (SAC ¶ 71.)

When Plaintiffs first experienced problems with the vehicle, they contacted CarMax and were told to take the vehicle to an authorized BMW repair facility as the vehicle was covered by the manufacturer's warranty.  (SAC ¶¶ 72, 73.)  In March 2015 with 29,578 miles on the vehicle, Plaintiffs took the vehicle to BMW Fresno for a drivetrain malfunction.  (SAC ¶¶ 74, 75.)  The vehicle had limited power and the drivetrain warning light was on.  (SAC ¶ 74.)  The light warned Plaintiffs "Drivetrain Malfunction: drive moderately, maximum output not available.  Consult service center."  (SAC ¶ 75.)

The vehicle has been taken in for repairs at least seven times requiring the vehicle to be out of service for several days.  (SAC ¶ 74.)  In April 2015, the vehicle was taken to BMW Fresno and the service record notes: "CHANGE ENGINE OIL AND FILTER MODIFY THE OIL SERVICE INTERVAL PROGRAMING AND ENCODE ALL AND E7X WITHOUT CAS" and "PERFORMED SIB 110614 CUSTOMER CARE PACKAGE."  (SAC ¶ 76.)  Plaintiffs believe that modification of the oil servicing interval was due to engine defects increasing oil consumption.  (SAC ¶ 76.)

On June 10, 2015, Plaintiffs took the vehicle to BMW Fresno for service because the check engine light came on and the vehicle was running rough again.  (SAC ¶ 77.)  The work order notes: "Performed applicable test plan and found faulty high pressure pump.  Found recall for high pressure pump not performed."  (SAC ¶ 77.)  The repair invoice further notes: "CHANGED VEHICLE BATTERY" and "PERFORMED SIB 130215 N63 REPLACE HIGH PRESSURE FUEL PUMPS."  (SAC ¶ 78.)  Plaintiff believes that the vehicle was experiencing a battery defect and the replacement of the high pressure fuel pump was caused by the defective condition of the vehicle's component parts.  (SAC ¶ 78.)

Plaintiffs took the vehicle for repair in late June 2015 due to the drivetrain malfunction light and check engine light coming on.  (SAC ¶ 79.)  During this time, Plaintiffs experienced a loss of power.  SAC ¶ 79.)

The vehicle was taken to BMW Fresno in August 2015.  (SAC ¶ 80.)  The repair order

states that Plaintiffs were experiencing problems with shifting the vehicle into gear and the check engine and drivetrain malfunction lights had illuminated. (SAC ¶ 80.) The work order references a "faulty low pressure fuel sensor" and notes "CONNECT BATTERY CHARGER" and "REVIEW VEHICLE HISTORY. HIGH FUEL PRESSURE PLASUIBILITY FAULTS. MISSFIRRE [sic] FAULTS, LOW PRESSURE FUEL FAULTS." (SAC ¶ 80.) These faults had been impacting the functionality and safe operation of the vehicle. (SAC ¶ 80.)

In September 2015, the vehicle was again returned to BMW Fresno after Plaintiffs experienced drivetrain malfunction and the engine malfunction light went on and Plaintiffs experienced power loss and shut-off. (SAC ¶ 81.) The repair order notes fault codes for "low fuel side pressure" and "replace fuel pump control module." (SAC ¶ 81.) Since they were unable to rely on the vehicle, Plaintiffs were only using it on a limited basis. (SAC ¶ 82.)

Plaintiffs returned the vehicle to BMW Fresno in August 2016 when they experienced drivetrain malfunction and the drivetrain malfunction light came on. (SAC ¶ 82.) The service order reflects "other faults including low fuel pressure and low boost pressure." (SAC ¶ 82.)

Although Plaintiffs are only using the vehicle on a limited basis, the vehicle burns oil at a rate of one quart per week. (SAC ¶ 83.) Despite having multiple opportunities to repair the vehicle, it has not been repaired and remains in defective condition impacting its ability to safely function. (SAC ¶ 84.) Plaintiffs have demanded a buy-back/repurchase of the vehicle due to its defective condition, but Defendants have refused to buy-back or repurchase the vehicle. (SAC ¶¶ 92, 93.)

Plaintiffs further allege that since 2008, if not before, Defendants knew or should have known of the defective condition of the "N63" engine which cause it to improperly burn off and/or consume abnormally high amounts of oil (Oil Defect); create excessive heat causing engine components to fail prematurely (Engine Defect), and causing premature wear on the battery requiring the battery to need to be replaced as often as every 10,000 miles or one year (Battery Defect), well before the useful life of an automotive battery. (SAC ¶ 95.)

The Oil Defect is a safety concern because oil is an essential lubricant for the moving parts of the engine which is needed for the engine to function properly. (SAC ¶¶ 96, 97.) The

Oil Defect can cause engine failure at any time while the vehicle is in operation exposing the occupants of the vehicle and others on the road to a serious risk of accident or injury. (SAC ¶ 97.) The Oil Defect requires the addition of substantial amounts of oil between scheduled oil changes and can result in engine damage. (SAC ¶ 98.) This defect can result in premature malfunction and failure of the engine components as experienced by Plaintiffs. (SAC ¶ 99.)

The Engine Defect causes excessive heat to the engine components causing premature failure, including failure of the fuel injectors and fuel pumps. (SAC ¶ 100.) The premature battery wear is a result of the excessive energy demands placed on the battery by the engine's cooling system components. (SAC ¶ 101.) Defendant BMW acknowledged this when they issued a technical service bulletin, SI B 61 30 14, in December 2014. (SAC ¶ 102.) This service bulletin instructed BMW dealers to replace the batteries of vehicles with the N63 engine at every oil service covered under the 4 year/50,000 mile BMW Maintenance Program. (SAC ¶ 102.) Defendant BMW acknowledged the remaining defects with the N63 engine when it extended warranties on the fuel delivery module in July 2015, engine vacuum pump in January 2016, and cylinder head covers crankcase ventilation line hoses in January 2016. (SAC ¶ 103.)

Plaintiffs believe that vehicles with the N63 engine have been referred to as a "bomb on wheels" or a "ticking time bomb." (SAC ¶ 105.) Plaintiffs contend that Defendants should have known of the defects in the vehicle as a result of prior consumer complaints and auto dealer service and inspection records. (SAC ¶ 106.) Plaintiffs contend that they had no way of knowing of the defects suffered by the vehicle prior to purchasing it. (SAC ¶ 107.)

At the time that Plaintiffs purchased the vehicle, the manufacturer's guidelines recommended engine oil replacement every 15,000 miles or two (2) years. (SAC ¶ 108.) In December 2014, Defendant BMW issued a service bulletin only to its service centers stating that Defendant BMW was changing this requirement and defective vehicles should have the oil changed every 10,000 miles or twelve months. (SAC ¶¶ 109, 110.) Defendant BMW did not notify consumers of this defect or identify this as a recall to avoid mandated notice to consumers. (SAC ¶ 110.)

If Plaintiffs had been aware of the defects with the vehicle they would not have

purchased it. (SAC ¶ 114.) Despite knowing of the defects with the vehicle, Defendant BMW and CarMax have not issued a recall of the vehicle, offered a suitable repair or replacement, or offered to reimburse costs associated with the defects. (SAC ¶ 115.) Due to the defects in the vehicle, Plaintiffs have suffered the loss of money, property, and value in the vehicle. (SAC ¶ 116.)

At all relevant times, CarMax was a licensed used car dealer in California that advertises to the public through its business locations, on the internet, and through other advertising media. (SAC ¶¶ 117, 130.) CarMax engages in advertising and representations as to the quality of the vehicles offered for sale to induce consumers to purchase its used vehicles. (SAC ¶ 118.) CarMax engaged in the business practice of advertising that its used vehicles were subjected to a rigorous 125-point inspection and each vehicle came with a "CarMax Quality Inspection Certificate" ("CQI"). (SAC ¶¶ 119, 120.) CarMax' mechanics and inspectors used an inspection checklist to notate the condition of each of the components inspected. (SAC ¶ 121.) This completed inspection checklist was not provided to consumers prior to the sale of the vehicle. (SAC ¶¶ 122-124.) This failure to provide the checklist conceals the actual condition of the vehicle and the condition of the individual components of the vehicle. (SAC ¶ 125.) Since the checklist was not provided, Plaintiffs did not know whether various components of the vehicle actually passed inspection, including those parts that failed shortly after purchase. (SAC ¶¶ 126-127.) CarMax did not maintain the completed inspection report which showed the status of each component part inspected. (SAC ¶ 128.) Plaintiff believes that the component parts that ultimately failed were defective at the time of sale and the vehicle should not have passed inspection. (SAC ¶ 129.)

CarMax inspection does not include an inspection or determination of whether there were any open manufacturer recalls for defective conditions existing in the vehicles that it advertises and sells to consumers. (SAC ¶ 134.) CarMax did not advertise that fact that it did not determine if there were any manufacturer recalls on the vehicles it sells to consumers. (SAC ¶ 136.) The burden to determine if there were any manufacturer recalls was on the consumer. (SAC ¶ 137.) CarMax had a business practice of having consumers acknowledge that they

received CarMax' notice for the consumer to contact the manufacturer of the vehicle regarding any open recalls at the time the purchase was completed. (SAC ¶ 139.) Plaintiffs were provided with and signed the document entitled "Important Information Regarding Your Purchase-Manufacturer Recalls". (SAC ¶ 141.) Plaintiffs contend that this practice is misleading and deceiving. (SAC ¶ 142.)

## III.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted." A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In assessing the sufficiency of a complaint, all well-pleaded factual allegations must be accepted as true. Iqbal, 556 U.S. at 678-79. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678.

In deciding whether a complaint states a claim, the Ninth Circuit has found that two principles apply. First, to be entitled to the presumption of truth the allegations in the complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011). Second, so that it is not unfair to require the defendant to be subjected to the expenses associated with discovery and continued litigation, the factual allegations of the complaint, which are taken as true, must plausibly suggest an entitlement to relief. Starr, 652 F.3d at 1216.

///

///

///

**IV.**

**DISCUSSION**

CarMax moves to dismiss the second amended complaint against CarMax in its entirety for failure to state a claim. CarMax argues that although the second amended complaint has included a number of allegations that were not in the previous complaints, the second amended complaint has not cured the defects and must be dismissed.

Plaintiffs counter that the second amended complaint alleges sufficient facts to establish plausible causes of action against CarMax. Plaintiffs state that the allegations in the second amended complaint are sufficient to state a claim for relief.[1]

**A.     Implied Warranty of Merchantability**

CarMax argues that the implied warranty of merchantability does not require that the vehicle be perfect or problem free, but that it will function for its intended purpose. CarMax contends that the second amended complaint fails to plead any allegations that Plaintiffs were unable to use the vehicle during the implied warranty's duration. Since the problems with the vehicle appeared months after the purchase, CarMax states that the implied warranty, which is coextensive with the express warranty, but never less than 30 days or more than 3 months, was not breached.

Plaintiffs counter that where a consumer's expectation is established by CarMax labeling

---

[1] Further, CarMax contends that the second amended complaint contains new allegations that were fabricated and included as a response to the prior motion to dismiss and are contradicted by the prior pleadings and exhibits attached to the complaint. Plaintiffs argue that CarMax' allegations that Plaintiffs fabricated new facts to support the second amended complaint are contemptable, false and without basis. Plaintiffs state that the allegations are true, and should be taken as true.

In ruling on a motion to dismiss, the Court is to take the factual allegations in the complaint as true. Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555. "[F]actual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001). Although the Court can consider inconsistent factual allegations that are not plead in the alternative or internal discrepancies in the pleading. Maloney v. Scottsdale Ins. Co., 256 F. App'x 29, 31 (9th Cir. 2007) (unpublished). Here, while CarMax argues that the allegations in the second amended complaint are contradicted by the prior pleadings and exhibits, the Court does not find any such inconsistencies. The allegations in the second amended complaint, while more detailed that those contained in the prior complaints, do not contradict the prior pleadings. Nor does the Court find that absence of these newly alleged facts in service records demonstrates that the allegations are false. CarMax's argument regarding the truth of the allegations is an issue to be resolved on summary judgment or at trial, not on a motion to dismiss. In addressing the motion to dismiss the Court construes the well pleaded allegations in the complaint as true.

the vehicle as rigorously inspected, certified, and a quality vehicle then it must do more than function within the express warranty period. Plaintiffs argue that they have sufficient alleged repeated functionality problems with the vehicle which existed at the time of the sale to state a claim based on the implied warranty of merchantability.

The Song-Beverly Act was enacted in 1970 and "regulates warranty terms; imposes service and repair obligations on manufacturers, distributors and retailers who make express warranties; requires disclosure of specified information in express warranties; and broadens a buyer's remedies to include costs, attorney fees and civil penalties." Nat'l R.V., Inc. v. Foreman, 34 Cal.App.4th 1072, 1080 (1995). The Act applies to consumer goods which are defined as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables." Cal. Civ. Code § 1791(a). Section 1795.5 extends the Act to the purchase of used consumer good. Cal. Civ. Code § 1795.5.

Pursuant to the Act, "every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." Daniel v. Ford Motor Co., 806 F.3d 1217, 1222 (9th Cir. 2015) (quoting Cal. Civ. Code § 1792). This implied warranty of merchantability means that the goods "(1) Pass without objection in the trade under the contract description[;] (2) Are fit for the ordinary purposes for which such goods are used[;] (3) Are adequately contained, packaged, and labeled[;] (4) Conform to the promises or affirmations of fact made on the container or label." Cal. Civ. Code § 1791.1(a). The implied warranty of merchantability is coextensive in duration to the express warranty, but cannot be less than 60 days nor more than one year following the sale of new consumer goods. Cal. Civ. Code § 1791.1(c). However, for used goods the implied warranty of merchantability shall be coextensive in duration with the express warranty, but in no event may it be less than 30 days. Cal. Civ. Code § 1795.5(c).

"Unlike express warranties, which are basically contractual in nature, the implied warranty of merchantability arises by operation of law" and "provides for a minimum level of quality." American Suzuki Motor Corp. v. Superior Court, 37 Cal.App.4th 1291, 1295–96

(1995).  Thus, to prevail on a breach of an implied warranty of merchantability claim, the plaintiff must show that the product "did not possess even the most basic degree of fitness for ordinary use."  Mocek v. Alfa Leisure, Inc., 114 Cal.App.4th 402, 406 (2003).  Unlike a claim for breach of an express warranty, the plaintiff need not provide the seller with an opportunity to repair the defect for a breach of the implied warranty of merchantability claim.  Mocek, 114 Cal.App.4th at 407.

"[T]he implied warranty of merchantability set forth in § 1791.1(a) requires only that a vehicle be reasonably suited for ordinary use.  It need not be perfect in every detail so long as it 'provides for a minimum level of quality.' "  Keegan v. Am. Honda Motor Co., 838 F.Supp.2d 929, 945 (C.D. Cal. 2012) (citations omitted).  The basic inquiry is whether the vehicle is fit for driving.  Keegan, 838 F.Supp.2d at 945.  The core test of whether a product is fit for its intended purpose is whether the product is "in safe condition and substantially free from defects."  Isip v. Mercedes–Benz USA, LLC, 155 Cal.App.4th 19, 26 (2007).  Courts in California "reject the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability.  A vehicle that smells, lurches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose."  Isip, 155 Cal.App.4th at 27.

CarMax argues that Plaintiffs fail to plead any facts that Plaintiffs were unable to use the vehicle within the implied warranty's duration.  However, Plaintiffs have alleged that within a few months of purchasing the vehicle it was running rough; had unexpected loss of power with vehicle hesitation and limited to no acceleration; vehicle shake, shudder or lugging; rough idling; problems shifting gears; and failure to start.  (SAC ¶ 66.)  Plaintiffs allege that they were stranded when the vehicle failed to start on at least one occasion and the vehicle would shut off in the middle of the roadway leaving Plaintiffs in a hazardous position.  (SAC ¶ 68.)  Plaintiffs contend they were not able to rely on the vehicle to start and accelerate as needed which impacted the safe operation of the vehicle and created a hazardous circumstance on the roadway.  (SAC ¶ 69.)  Plaintiffs were stranded on multiple occasions because the vehicle failed to operate.  (SAC ¶ 70.)  Due to the loss of acceleration, issues with gear shifting, shake and shuddering of

the vehicle, stalling and failure to start, the vehicle is not in a safe condition. (SAC ¶ 71.)

Defendant argues that courts have widely criticized the holding in Mexia v. Rinker Boat Co., 174 Cal.App.4th 1297 (2009), that there is no requirement that the purchaser discover and report to the seller a latent defect within the warranty period. Mexia, 174 Cal.App.4th at 1310. However, the Ninth Circuit addressed this in Daniel, finding that, while California federal district courts have given Mexia mixed treatment, we must adhere to state court decisions—not federal court decisions—as the authoritative interpretation of state law." Daniel, 806 F.3d at 1223. CarMax does not cite any California state case that conflicts with the holding in Mexia. As recognized in Daniel, the California Supreme Court denied the defendant's petition for review and a non-party's request for depublication of the opinion in Mexia; and there is no evidence that the California Supreme Court would decide the case differently. Daniel, 806 F.3d at 1222.

At the pleading stage, the allegations in the second amended complaint are sufficient to allege that the vehicle was not fit for its intended purpose, Isip, 155 Cal.App.4th at 27, as it was not in safe condition and substantially free of defects, Mexia, 174 Cal.App.4th at 1303; see also In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prod. Liab. Litig., 890 F.Supp.2d 1210, 1222 (C.D. Cal. 2011) (allegation that vehicle has ABS defect which delayed breaking and dangerously increases stopping distance sufficient to allege violation of the implied warranty of merchantability).

CarMax argues that there are no facts alleged that the vehicle was unusable during the implied warranty period. However, as discussed above, the vehicle need not be unusable to breach the implied warranty of merchantability. Plaintiffs allege that the defects manifested within a few months of purchasing the vehicle and such defects made the vehicle unsafe to operate. "The implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale." Mexia, 174 Cal.App.4th at 1304. "A vehicle that operates for some time after purchase may still be deemed 'unfit for ordinary purposes' if its components are so defective that the vehicle becomes inoperable within an unacceptably short period of time." Keegan, 838 F.Supp.2d at 948.

CarMax also argues that the implied warranty would not cover defects which arose after

Defendant BMW repaired the vehicle. Here, Plaintiffs contend that the defects in the vehicle existed at the time of purchase but were not discovered until several months later. Whether the defects existed at the time the vehicle was purchased or arose after Defendant BMW repaired or replaced vehicle components is an issue that is not suitable for decision on a motion to dismiss. Mexia, 174 Cal.App.4th at 1309.

The Court finds that the allegations in the second amended complaint are sufficient to state a cognizable claim for breach of the implied warranty of merchantability under the Song-Beverly Act.

## B. CLRA and UCL Claims

The Court has previously found that Plaintiffs have alleged that the defendants engaged in a unified course of fraudulent conduct that is grounded in fraud and the claims under the CLRA and UCL in this action must satisfy the particularity pleading requirement of Rule 9(b). (See ECF No. 33 at 17-19); Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009). Therefore, Plaintiffs are required to plead with more specificity including an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal punctuation and citations omitted). Since Plaintiffs' UCL claim arises under the conduct precluded by the CLRA, the Court shall evaluate the alleged CLRA and UCL claims together.

The CLRA provides a list of unfair methods of competition and unfair or deceptive acts or practices that are unlawful if taken with the intended result or that result in the sale or lease of goods or services to a consumer. Civ. Code § 1770. Conduct that is likely to mislead a reasonable consumer violates the CLRA. Colgan v. Leatherman Tool Group, Inc., 135 Cal.App.4th 663, 680 (2006). "A 'reasonable consumer' is an 'ordinary consumer acting reasonably under the circumstances,' who 'is not versed in the art of inspecting and judging a product, [or] in the process of its preparation or manufacture'." Asghari v. Volkswagen Grp. of Am., Inc., 42 F.Supp.3d 1306, 1314 (C.D. Cal. 2013). The acts and practices under the CLRA include "[r]epresenting that goods ... have characteristics ... which they do not have," Cal. Civ. Code § 1770(a)(5), and [r]epresenting that goods ... are of a particular standard, quality, or grade,

... if they are of another," id. § 1170(a)(7)." Smith v. Ford Motor Co., 749 F.Supp.2d 980, 987 (N.D. Cal. 2010), aff'd, 462 F. App'x 660 (9th Cir. 2011). "The CLRA is to be 'liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.' " Colgan, 135 Cal. App. 4th at 680 (citations omitted.)

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Bus. & Prof. Code § 17200. "An act can be alleged to violate any or all three of the prongs of the UCL—unlawful, unfair, or fraudulent." Stearns v. Select Comfort Retail Corp., 763 F.Supp.2d 1128, 1149 (N.D. Cal. 2010) (quoting Berryman v. Merit Prop. Mgmt., Inc., 152 Cal.App.4th 1544, 1554 (2007)). Plaintiffs contend that Defendant's conduct violates all three prongs of the UCL. (SAC ¶¶ 222-224.)

Plaintiffs allege that CarMax violated the CLRA by representing and certifying the quality and character of the vehicle; representing it had been inspected for defects, was certified to be free of defects, and warranting the condition, quality, and status of the vehicle; not providing a completed inspection report as required by Vehicle Code § 11713.18(a)(6); failing to disclose and conceal material information regarding the actual quality and condition of the vehicle; misrepresenting the benefits and use of the vehicle inspection by failing to inspect the vehicle history and status for any open manufacturer recalls; and misrepresenting the benefits of the limited 30 day warranty period. (SAC ¶¶ 188-205.)

1.    CarMax' Statements

CarMax contends that the majority of the representations identified in the second amended complaint are mere puffery and are not actionable under the CLRA. Plaintiff responds that CarMax statements affirmatively distinguished the BMW from other used cars offered for sale by their misleading advertising. Plaintiffs argue that these statements are not mere puffery but have a legal consequence.

While Plaintiffs attempt to allege a claim based on CarMax' representation as to the reliability of the vehicles that they sell, it cannot reasonably be inferred that such statements are intended to guarantee that no problems will occur with a used vehicle after it is purchased. As

noted in <u>Daugherty</u>,

> "[V]irtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a 'latent defect' that existed at the time of sale or during the term of the warranty.  All parts will wear out sooner or later and thus have a limited effective life.  Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time.... [M]anufacturers ... can always be said to 'know' that many parts will fail after the warranty period has expired.  A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations in warranty coverage."

<u>Daugherty v. Am. Honda Motor Co.</u>, 144 Cal.App.4th 824, 830–31 (2006), as modified (Nov. 8, 2006) (citing <u>Abraham v. Volkswagen of America, Inc.</u>, 795 F.2d 238, 250 (2d Cir.1986).

Further, such general statements as to reliability have been found to be puffing.  'Puffing' has been described by most courts as involving outrageous generalized statements, not making specific claims, that are so exaggerated as to preclude reliance by consumers."  <u>Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc. ("Cook")</u>, 911 F.2d 242, 246 (9th Cir. 1990); <u>see also</u> <u>Anunziato v. eMachines, Inc.</u>, 402 F. Supp. 2d 1133, 1139 (C.D. Cal. 2005) ("Generalized, vague, and unspecified assertions constitute 'mere puffery' upon which a reasonable consumer could not rely, and hence are not actionable.").  " 'Puffing' is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely and is not actionable. . . ."  <u>Southland Sod Farms v. Stover Seed Co.</u>, 108 F.3d 1134, 1145 (9th Cir. 1997).  In advertising, puffery is considered to be statements that are vague or highly subjective.  <u>Cook</u>, 911 F.2d at 246.

In <u>Anunziato</u>, the defendant asserted that the product offered "outstanding quality, reliability, and performance" and each laptop "passes through the most stringent quality control tests to ensure that you will be provided with the best product possible."  <u>Id.</u>  The defendant asserted that it "stood behind our value proposition to our customers – to provide best-of-class service and support in addition to high-quality, brand-name components at affordable prices.  If you ever have a problem, our knowledgeable, dedicated Customer Care department will provide you with fast, considerate service."  <u>Id.</u>  In addition, the defendant issued a press release stating that it offers consumers the best-in-value wide-screen notebook PC available.  <u>Id.</u>  The <u>Anunziato</u> found that the works quality, reliably, performance, latest technology, and high

quality were nonactionable puffery because they are general, vague common place terms or subjective characterizations that have been held to be puffery.  Id. at 1139-40.  However, "most stringent quality control tests" was actionable because it is a specific factual assertion that could be established or disproved through discovery.  Id. at 1140.

Similarly here, most of the statements contained in Plaintiffs' second amended complaint regarding CarMax' representations and advertisement are nonactionable puffery.  Plaintiff alleges that CarMax represented that its certified vehicles were "of higher quality than other similar vehicles on the market (SAC ¶ 17); "we carefully select, renew, and protect every CarMax car ensures our commitment to quality is met" (id. ¶ 24); selects only the best used cars (id. ¶ 25); CarMax provided quality, value, service and a company you can trust (id. ¶ 27); "CarMax quality is knowing that you can depend on your car, day after day, year after year" (id. ¶ 28); a CarMax car is scrutinized like no other (id. ¶ 30); CarMax invests time and money renewing every new car so the consumer does not have to (id. ¶ 31).

Statements regarding the high quality of a product come under the category of non-actionable puffery that no reasonable person could rely on in making a decision.  Anunziato, 402 F. Supp. 2d at 1140; see also Corley v. Rosewood Care Ctr., Inc. of Peoria, 388 F.3d 990, 1009 (7th Cir. 2004) (term high quality is highly subjective and without elaboration comes under the category of sales puffery); Osborne v. Subaru of Am., Inc., 198 Cal.App.3d 646, 660 (Ct. App. 1988) ("Sellers are permitted to 'puff' their products by stating opinions about the quality of the goods so long as they do not cross the line and make factual representations about important characteristics like a product's safety").

The word reliability is similarly non-actionable puffery.  Anunziato, 402 F.Supp.2d at 1140.  Advertising that asserts that one product is superior is not actionable.  Summit Tech., Inc. v. High-Line Med. Instruments, Co., 933 F. Supp. 918, 931 (C.D. Cal. 1996).  "The word 'reliable' is inherently vague and general" and is not capable of being objectively verified and cannot be expected to induce reasonable consumer reliance.  Summit Tech., Inc., 933 F. Supp. at 931.

The Court finds that Plaintiffs' have failed to allege a claim for misrepresentation based

upon CarMax' statements as to the reliability of their vehicles and their high quality standards. However statements regarding the specific condition of the vehicle, the manufacturer's warranty, certification by CarMax' quality inspection, and CarMax' warranty are not mere puffery as these can be established or disproved through discovery.

## 2. Failure to Disclose Defect

CarMax argues that it did not have a duty to disclose potential problems with the vehicle and the complaint is devoid of any facts showing that the alleged representations regarding the quality of the vehicle were false. CarMax contends that the alleged defect was a design flaw with the engine that Plaintiff alleges the manufacturer did not identify until a month after Plaintiffs purchased the vehicle. CarMax states it would be unreasonable to assume that CarMax discovered the design defect before the manufacturer when the vehicle itself did not manifest the defect until months after it was sold.

Plaintiffs argue that CarMax concealed the results of the vehicle inspection and failed to maintain those results raising legitimate questions of whether the components that failed were actually inspected and, if they were, the condition of the parts. Plaintiff further argues that CarMax has concealed its standards for passing the inspection such that the percentage of acceptable defective components is unknown. (ECF No. 38 at 23-24.) However, Plaintiffs do not dispute that an inspection took place. (Id. at 24.)

"Under California law, there are four circumstances in which an obligation to disclose may arise: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." Cholakyan v. Mercedes-Benz USA, LLC, 796 F.Supp.2d 1220, 1234 (C.D. Cal. 2011) (citations omitted); Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1142 (9th Cir. 2012). California courts have generally rejected a broad obligation to disclose, holding "that a manufacturer is not liable for a fraudulent omission concerning a latent defect under the CLRA, unless the omission is 'contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose.' "

Wilson, 668 F.3d at 1141 (quoting Daugherty, 144 Cal.App.4th 826).  Therefore, "[a] manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue." Wilson, 668 F.3d at 1141 (citations omitted).

"California federal courts have held that, under the CLRA, plaintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss." Wilson, 668 F.3d at 1145; Becerra v. Gen. Motors LLC, 241 F.Supp.3d 1094, 1110 (S.D. Cal. 2017).  Here, Plaintiffs allege that since 2008, if not before, Defendants knew or should have known that BMW vehicles with an "N63" engine contained design and or manufacturing defects. (SAC ¶ 95.)  Plaintiffs contend that Defendants should have known of the defects in the vehicle as a result of prior consumer complaints and auto dealer service and inspection records.  (SAC ¶ 106.)  However, courts have found that customer complaints in and of themselves do not adequately support an inference that a manufacturer was aware of a defect as they merely establish that some customers were complaining.  Wilson, 668 F.3d at 1145.  This would be more so in the case of CarMax, a third party seller, where there are no allegations in the complaint that CarMax routinely services vehicles with the N63 engine.

Additionally, Plaintiffs allege that in December 2014, Defendant BMW issued a service bulletin only to its service centers stating that Defendant BMW was changing the frequency of oil change requirements and defective vehicles should have the oil changed every 10,000 miles or twelve months.  (SAC ¶¶ 109, 110.)  Defendant BMW did not notify consumers of this defect or identify this as a recall to avoid mandated notice to consumers.  (SAC ¶ 110.)  Defendant BMW acknowledged the defects in a technical service bulletin issued December 2014.  (SAC ¶ 102.)  Further defects were acknowledged in July 2015, and January 2016.  (SAC ¶ 103.) According to Plaintiffs' complaint, the first service bulletin issued a month after Plaintiffs purchased the vehicle from CarMax and was issued only to BMW service centers so that consumers would not be notified of the defect.  The fact that the service bulletins were issued after the vehicle was purchased and only to BMW service centers fails to demonstrate that CarMax would have knowledge of the defect at the time the vehicle was sold.

Plaintiffs allege that within a few months of purchase they experienced mechanical

defects in the vehicle. (SAC ¶ 65.) CarMax failed to provide Plaintiffs with a completed inspection report for the vehicle. (SAC ¶ 127.) Because of the nature of the component failures as documented in the repair orders the relevant parts were defective at the time of sale and could not have passed inspection. (SAC 129.)

Plaintiffs' do not challenge that the vehicle was inspected and the first indication that there was a problem with the vehicle was months after purchasing the vehicle when Plaintiffs experienced mechanical defects and conditions with the vehicle that impacted its functionality and safe and reliable operation. (SAC ¶ 65.) In March 2015 with 29,578 miles on the vehicle, Plaintiffs took the vehicle to BMW Fresno for a drivetrain malfunction. (SAC ¶¶ 74, 75.) The vehicle had limited power and the drivetrain warning light was on. (SAC ¶ 74.)

The complaint is devoid of any facts from which it can be inferred that CarMax was aware that the vehicle contained a defect in the engine prior to Plaintiffs' purchase of the vehicle. Plaintiffs have failed to state a claim against CarMax based on the failure to disclose a defect with the vehicle. Further, Plaintiffs have been provided with the opportunity to file an amended complaint to cure the deficiencies in this claim and the amended complaint contains the same allegations which fail to allege that CarMax had knowledge of the defects prior to the sale of the vehicle. The Court finds that granting further leave to amend would be futile and the claim based on failure to disclose the engine defect shall be dismissed without leave to amend.

3. Representation as to the Quality of the Vehicle

CarMax contends that the only specific factual statements identified that are not puffery are that CarMax inspected the vehicle and it passed inspection. CarMax states that there is nothing to suggest that the representation that the vehicle was inspected and passed inspection was false. Further, CarMax argues that there is nothing to suggest that CarMax misrepresented the quality of the vehicle.

Plaintiffs respond that there is not dispute that CarMax did not provide Plaintiffs with a completed inspection report for the vehicle in violation of Vehicle Code section 11713.18(a)(6) which is actionable under the CLRA and UCL. Plaintiffs further argue that CarMax' representations went beyond just the offer for sale and affirmatively distinguished CarMax' used

cars from other cars on the market and made representations as to the quality of the vehicle due to the mechanical soundness found by their technicians.

The second amended complaint alleges that CarMax misrepresented the quality of the vehicle by certifying the vehicle met its rigorous 125-point quality inspection without providing a completed inspection report that complied with Vehicle Code section 11713.18(a)(6); and certifying that the vehicle was free of defects and warranting the condition, quality and status of the vehicle. (SAC ¶¶ 189-191, 199, 202, 206.)

Plaintiffs allege that CarMax did not provide them with an inspection report in compliance with section 11713.18(a)(6) of the Vehicle Code. Section 11713.18 provides that it is a violation for any dealer to advertise or sell a used vehicle as "certified" if "prior to sale, the dealer fails to provide the buyer with a completed inspection report indicating all the components inspected. Cal. Veh. Code § 11713.18(a)(6). Plaintiffs allege that CarMax used an inspection checklist for its mechanics or technicians to notate the condition of all the components of the vehicle that were inspected. (SAC ¶ 121.) However, this checklist was not provided to them prior to purchase of the vehicle to conceal the results of the inspection. (SAC ¶¶ 122, 123, 126.) Instead, Plaintiffs were provided with a CQI. (ECF No. 35 at 51.)

In October 2016, the Ninth Circuit found that, as a matter of law, CarMax's CQI certificates are not a completed inspection report. Gonzales v. CarMax Auto Superstores, LLC, 840 F.3d 644, 654 (9th Cir. 2016).[2] Accordingly, CarMax' failure to provide an inspection report violates section 11713.18(a)(6). CarMax argues that the second amended complaint fails to allege that Plaintiffs suffered any damages from this alleged procedural failure. However, Plaintiffs allege that they paid for a certified vehicle and the vehicle they received would not qualify as a certified due to the defects present at the time of sale and the vehicle has less value due to the defects. (SAC ¶¶ 33, 44, 45, 46, 59, 86, 87, 89, 114, 116, 127, 129, 161, 210.) This is sufficient to allege actual damages. Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 323

---

[2] In unpublished decisions, California courts have expressly ruled that the CQI report satisfies section 11713.18(a)(6). Csiza v. CarMax Auto Superstores California, LLC, No. D065916, 2015 WL 4457307, at *8 (Cal. Ct. App. July 21, 2015); Brooks v. CarMax Auto Superstores California, LLC, 246 Cal.App.4th 973, 201 Cal.Rptr.3d 138, 144 (2016), ordered not to be officially published (Aug. 10, 2016).

(2011).

Courts hold that a technical violation of section 11713.18 is insufficient to allege that the vehicle was not certified. See Stelzer v. CarMax Auto Superstores California, LLC, No. 13-CV-1788-LAB-JMA, 2013 WL 6815029, at *4 (S.D. Cal. Dec. 20, 2013) (technical violation of section 11713.18 does not by itself allege that the vehicle was not certified); Chulick-Perez v. CarMax Auto Superstores California, LLC, 71 F.Supp.3d 1145, 1151 (E.D. Cal. 2014) (bare allegation that vehicle was alleged to be certified and no report was provided insufficient to state a claim under the CLRA or UCL); Zambrano v. CarMax Auto Superstores, LLC, No. 13CV2107-WQH-WMC, 2014 WL 228435, at *6 (S.D. Cal. Jan. 21, 2014) (complaint fails to allege sufficient facts to show that the vehicle was not certified).

Here, Plaintiffs allege that the vehicle could not have passed inspection due to the nature of the defects as documented in the repair orders. (SAC ¶ 129.) Plaintiffs allege that CarMax, through its website, advertising, and sales personnel represented that its vehicles are superior to other used vehicles because they certify each vehicle and the subject vehicle had been subjected to the rigorous 125 point quality inspection and found to be free from defects. Plaintiffs further allege that they believe that when the vehicle was delivered to them it was in defective condition. (SAC ¶¶ 63, 64.) Within a few months of purchase Plaintiffs experienced mechanical defects. (SAC ¶ 65.) CarMax failed to provide Plaintiffs with a completed inspection report for the vehicle. (SAC ¶ 127.) Because of the nature of the component failures as documented in the repair orders the relevant parts were defective at the time of sale and could not have passed inspection. (SAC 129.)

Plaintiffs purchased the vehicle on November 4, 2014. (SAC ¶ 33.) Within a few months of purchase the vehicle experienced mechanical defects. (SAC ¶ 65.) On March 11, 2015, Plaintiffs took the vehicle for service because the drivetrain malfunction light and the seat calibration light were on.[3] (ECF No. 35 at 58.) A standard scope was performed, the oil and

---

[3] A court generally cannot consider material outside of the complaint when ruling on a motion to dismiss. Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). However, the incorporation by reference doctrine allows material that is attached to the complaint to be considered, as well as "unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is

filter were changed, and a vehicle check was performed.  (Id.)

On May 8, 2015, the vehicle was seen for what appears to be a recall on the rear left air spring which was replaced.  (ECF No. 35 at 59.)  The timing chain was checked and no replacement was necessary.  (Id.)  The engine oil and filter were changed and the service interval was modified.  (Id.)

On June 10, 2015, the vehicle was returned because the check engine light was on and it was running rough.  (ECF No. 35 at 61.)  The vehicle battery was charged and a fault code was found for cylinder injection cutout.  (Id.)  Pressure was too low in the high pressure fuel system and there was a faulty fuel pump for which there was a recall that had not been performed.  (Id.)  The high pressure fuel pump was replaced.  (Id.)

The vehicle was taken for service on June 25, 2015 because the drivetrain malfunction light and check engine light were on.  (ECF No. 35 at 63.)

On August 18, 2015, the vehicle was returned for service because the drivetrain malfunction light and check engine light came on.  (ECF No. 35 at 64.)  The vehicle felt like it would not go into other gears.  High fuel pressure plausibility faults, misfire faults, and low pressure fuel faults were found.  (Id.)  The tests showed a faulty low pressure fuel sensor.  (Id.)

On September 25, 2015, the vehicle was in for repair because the engine malfunction light came back on indicating a drivetrain malfunction.  (ECF No. 35 at 66.)  The low pressure fuel pressure sensor was replaced and there were no running problems found.  (Id.)  The fuel pump control module and program/code module were replaced.  (Id.)

On August 3, 3016, the vehicle was in for service and the drivetrain malfunction lamp was on.  (ECF No. 35 at 68.)  Cylinder 1, 2 and 3 misfires were recorded and it was noted that the spark plugs were overdue 2858 miles.  (Id.)  The memory fault showed faults for cylinder 1, 2, and 3 misfires.  (Id.)  The spark plugs needed to be replaced and there were also low fuel pressure and low boost pressure faults.  (Id.)  Plaintiffs declined spark plug service to the vehicle.  (Id.)

---

central to plaintiff's claim; and (3) no party questions the authenticity of the document."  United States v. Corinthian Colleges, 655 F.3d 984, 999 (9th Cir. 2011).

While the lack of a certification documentation is insufficient by itself to demonstrate that the vehicle was not certified pursuant to CarMax' certification program, Plaintiffs allege that due to the nature of the component failures the vehicle could not have or should not have passed inspection. Further, Plaintiffs allege that CarMax failed to provide them with a completed inspection report to conceal the results of the inspection. Here, the vehicle began exhibiting mechanical problems within several months of purchase. At the pleading stage, the Court finds that Plaintiffs second amended complaint contains sufficient allegations to state a claim under the CLRA for misrepresenting that the vehicle was certified.

### 4.    Failure to Investigate Recall Information

Plaintiffs allege that CarMax misrepresented the benefits and use of its quality inspection because CarMax does not inspect the vehicle history and status for any open recalls on the vehicle. (SAC ¶¶ 195, 204, 205.)

CarMax contends that it was under no duty to investigate recalls and informed Plaintiffs that it did not do such an investigation. Further, CarMax argues that Plaintiffs fail to allege any injury and actual damage is a prerequisite to a CLRA claim.

Plaintiffs allege that CarMax violated section 1770 by failing to investigate recall information on the vehicle. (SAC ¶¶ 204, 205.) For each form of relief sought in federal court, Plaintiffs must establish standing. Mayfield v. United States, 599 F.3d 964, 969 (9th Cir. 2010), cert. denied, 131 S. Ct. 503 (2010). This requires Plaintiffs to "show that [they are] under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to challenged conduct of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." Summers v. Earth Island Institute, 555 U.S. 488, 493 (2009) (citation omitted); Mayfield, 599 F.3d at 969 (citation omitted).

"In order to establish standing [to assert a] CLRA claim [a] Plaintiff[ ] must establish [that he] suffered an actual injury as a result of [defendant's] alleged conduct." Cholakyan, 796 F.Supp.2d at 1228 (citing Contreras v. Toyota Motor Sales USA, Inc., No. C 09–06024 JSW, 2010 WL 2528844, *4 (N.D. Cal. Jun. 18, 2010; Birdsong v. Apple, Inc., 590 F.3d 955, 959–60

(9th Cir.2009); <u>Aron v. U–Haul Co. of California</u>, 143 Cal.App.4th 796, 802 (2006)).

"To establish standing under the Section 17200 claim, Plaintiffs must show they suffered an injury in fact and have lost money or property as a result of the alleged unfair competition." <u>Cholakyan</u>, 796 F.Supp.2d at 1228 (citing <u>Contreras</u>, 2010 WL 2528844 at *4; <u>Aron</u>, 143 Cal.App.4th at 802; <u>Brownfield v. Bayer Corporation</u>, 2009 WL 1953035 at *3 (E.D. Cal. July 6, 2009)).

In this instance, Plaintiffs allege that Defendant BMW concealed the defects in the vehicle to avoid a recall. (SAC ¶ 110.) Despite knowing of the defects with the vehicle, Defendant BMW and CarMax have not issued a recall of the vehicle. (SAC ¶ 115.) Plaintiffs do not have standing to bring a claim based on the failure to investigate whether there had been a recall of the vehicle. Plaintiffs cannot demonstrate any injury due to the failure to investigate if there was a recall on the vehicle as there was no recall for the vehicle. Therefore, this claim is dismissed without leave to amend.

5. <u>Warranty</u>

CarMax contends that Plaintiffs were provided with the 30 day express warranty when the vehicle was purchased which included the provision that any manufacturer's warranty was to be exhausted. CarMax argues that as Plaintiffs were provided with the terms of the express warranty the warranty claim must be dismissed. Further, CarMax argues that the buyer's guide is a federally mandated disclosure documents and the contents is prescribed by federal regulation 16 C.F.R. § 455. The buyer's guide specifically directed Plaintiffs to ask for a copy of the warranty document for a full explanation of warranty coverage, exclusions, and the dealer's repair obligations. CarMax contends that Plaintiffs have failed to state a claim based on the express thirty day warranty.

Plaintiffs counter that at the time of sale Plaintiffs were provided with a 4 page warranty document which on the last page included the statement that "in the event a manufacturer's warranty or an extended service plan applies to a Covered Part, coverage under the warranty or plan shall be exhausted prior to being covered by the Warranty." Plaintiffs contend that because this information was not provided at the outset of the purchase or near the buyer's guide the

warranty is misleading and deceptive.  Plaintiffs argue that this was misleading because it switched what was first offered to something different at the time of completing the sales documents.

CarMax replies that it did not misrepresent the terms of the express warranty, and even if they did, Plaintiffs fail to show how they were damaged as they did not seek repair of the vehicle during the thirty day extended warranty period.

On November 2 or 3, 2014, Plaintiffs were told by Mr. Martinez that the vehicle had the factory warranty.  (SAC ¶ 21.)  The vehicle was warranted by BMW.  (SAC ¶ 37.)  At the time of purchase the vehicle had 26,135 miles on the odometer and had the balance of the BMW basic factory warranty remaining.  (SAC ¶ 38.)  The buyer's guide stated the there was a limited, rather than full warranty indicating that "[t]he dealer will pay 100% of the labor and 100% of the parts for the covered parts that fail during the warranty period.  Ask the dealer for a copy of the warranty document for a full explanation of warranty coverage, exclusions, and the dealer's repair obligations."  (ECF No. 35 at 48.)  Plaintiff argues that this was misleading because the warranty that was provided stated "In the event a manufacturer's warranty or an extended warranty service plan applies to a Covered Part, coverage under the warranty or plan should be exhausted prior to being covered by this Warranty."  (ECF No. 35 at 56.)

While Plaintiffs allege that the limited warranty statement on the buyer's guide was misleading, the buyer's guide itself informed Plaintiffs that the warranty was not full but was limited.  Plaintiffs were informed and aware that the vehicle was still under the manufacturer's warranty which influenced their decision to purchase the vehicle.  (SAC ¶¶ 17, 21, 38, 40, 41.)

First, the Court finds no statement in the second amended complaint which would mislead a reasonable consumer due to the limited warranty statement on the buyer's guide.  The CLRA is violated by conduct that is likely to mislead a reasonable consumer, Colgan, 135 Cal.App.4th at 680, and a " 'reasonable consumer' is an 'ordinary consumer acting reasonably under the circumstances,' who 'is not versed in the art of inspecting and judging a product, [or] in the process of its preparation or manufacture'."  Asghari, 42 F.Supp.3d at 1314.  Here, the buyer's guide itself states that the warranty is limited and directs the consumer to request a copy

of the warranty for the full coverage. The Court finds that no reasonable consumer would be misled to believe that CarMax was representing there would be no limitations on the coverage provided by the warranty. As demonstrated by Plaintiffs complaint, when buying a used car the fact that the vehicle comes with the manufacturer's warranty is relied by upon by the consumer in deciding to purchase a specific vehicle. Therefore, a reasonable consumer would understand that there exists a manufacturer's warranty that would also provide coverage for the vehicle. Plaintiffs' allegations are not sufficient to show that the buyer's guide was likely to deceive a reasonable consumer regarding the limited warranty. Nor does the second amended complaint contain any statements by CarMax or its employees that would have led a reasonable consumer to believe that the express warranty was other than that stated in the actual document provided. The Court finds that the allegations in the second amended complaint are insufficient to state a claim based upon CarMax' express thirty day warranty.

Second, the Court finds that Plaintiffs do not have standing to bring a claim based upon the limited warranty as they cannot demonstrate they suffered actual injury due to the CarMax' conduct. Cholakyan, 796 F.Supp.2d at 1228. CarMax warranted the covered parts for thirty days. (ECF No. 35 at 53-56.) As the second amended complaint alleges, the vehicle did not demonstrate any mechanical problems until several months after purchase and after the express warranty period had expired. Therefore, this claim shall be dismissed without leave to amend.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1.    CarMax' motion to dismiss, filed November 7, 2017 is GRANTED IN PART AND DENIED IN PART as follows:

a.    CarMax' motion to dismiss the CLRA and UCL claims based on failure to disclose a defect with the vehicle, failure to investigate whether there had been a recall on the vehicle, and the express warranty are GRANTED and these claims are dismissed without leave to amend;

b.    CarMax' motion to dismiss is DENIED for all other claims;

2.    The hearing set before the undersigned on December 13, 2017 is VACATED; and

3.    CarMax shall file an answer to complaint within **ten (10) days** of the entry of this order.

IT IS SO ORDERED.

Dated:    **December 12, 2017**

UNITED STATES MAGISTRATE JUDGE